**FIRST DIVISION**
**BARNES, P. J.,**
**DOYLE, P. J., and LAND, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

June 26, 2023

# In the Court of Appeals of Georgia

A23A0302. WILLIAMS v. PHILLIPS.

DOYLE, Presiding Judge.

Delano Williams, the father of minor child J. K. M. (the "father"), appeals from the trial court's order awarding custody to the child's maternal grandmother, Dorothy Phillips (the "grandmother").[1] The father contends the trial court erred in concluding that J. K. M. would suffer long-term emotional harm if custody were awarded to him. For the following reasons, we reverse and remand with direction.

> When reviewing an order in a child custody case, we view the evidence in the light most favorable to the trial court's decision. We will not set aside the trial court's factual findings if there is any evidence to support them, and we defer to the trial court's credibility determinations.

---

[1] Both the father and grandmother filed petitions for custody, and the trial court consolidated the cases.

We review de novo, however, the legal conclusions the trial court draws from the facts.[2]

So viewed, the record shows the following. J. K. M. was born in 2015 to unmarried parents. The father moved to Texas in 2016, less than a year after the child was born, but he moved back to Atlanta when J. K. M.'s mother (the "mother") said she needed help with the baby. The father helped take care of J. K. M. until August 2018, when he moved to Texas for a new job. Two months later, the father learned that the Division of Family and Children Services ("DFCS") had removed J. K. M. from the mother's custody. The father contacted DFCS and asked for custody, but DFCS advised that he needed to legitimate the child first. Although the father reached out to an attorney in November 2018, he was not able to file a petition for legitimation and custody until August 2019. The trial court granted the petition and entered an order of legitimation in December 2019.

When DFCS removed J. K. M. from the mother's custody, he was placed with the grandmother, who was also raising the mother's two teenage sons. In the year and a half prior to the DFCS placement, J. K. M. had spent a lot of time in the

_____

[2] (Citations omitted.) *Mashburn v. Mashburn*, 353 Ga. App. 31, 32 (836 SE2d 131) (2019).

2

grandmother's home when the mother needed help. The child had some issues with his speech, and the grandmother enrolled him in speech therapy and completed exercises with him. In 2019, DFCS recommended that the grandmother be awarded permanent guardianship of J. K. M. because the mother was not taking the medication she needed to be able to function. The mother initially agreed with DFCS's recommendation. Later, however, the mother opposed the plan, and during the June 2021 final hearing she asserted that the grandmother's husband had sexually abused her as a child and described their family as "very dysfunctional," and asked the court to award custody to the father. When the grandmother took the stand, she testified that although she was "not yet" divorced, she had not lived with her husband for years.

The father visited J. K. M. in November and December 2018, after he moved to Texas. He saw the child only a few times in 2019, in part because he was living in Texas and his visitation periods were limited to two hours at a time. Then, once the COVID-19 pandemic struck in 2020, the father stopped traveling altogether. The father communicated with J. K. M. on FaceTime, once or twice a month before the July 2020 hearing and at least once a week after that hearing.

At the time of the final hearing in June 2021, the father was living with his wife of two years and his eight-year-old stepdaughter in a three bedroom home that had space for J. K. M. The father and his wife both worked, and their combined income was over $100,000. The father's community in Texas had adequate medical facilities and any therapists J. K. M. would need to see, and the father's insurance would be able to cover J. K. M. Additionally, the father had found a school that would be appropriate for the child. The father admitted that he was in arrears as to child support, but explained that he had set up a garnishment and was thereafter unable to revise the amount that was taken from his paycheck. He also asserted that he had sent extra payments in some months.

The grandmother admitted she had no evidence that the father would be an unfit parent, but testified that because J. K. M. is so bonded to her and his brothers, she believed that removing him from their home would cause "a lot of psychological issues." The grandmother's daughter, J. K. M.'s aunt, also testified that because of J. K. M.'s strong bond with the grandmother and his brothers, it was in his best interest to continue to live with the grandmother.

In August 2021, the court entered a final order awarding permanent legal and physical custody to the grandmother and visitation rights to the father. In its order,

the trial court recognized that the father and his wife had maintained steady employment in spite of the COVID-19 pandemic and that the father had legitimated the child. The court further observed, however, that J. K. M. had lived with the grandmother and his two older brothers, of whom the grandmother has custody through a permanent guardianship, since 2017. The court found that the child has "a very strong bond" with the grandmother and his brothers, emphasizing that she had been his caretaker "for the vast majority of his life." The court also noted that although the mother's instability made her unfit to have custody of the child, the grandmother allowed her to have access to J. K. M. and the mother-child relationship would be severed if the child were relocated to Texas.

As to the father, the trial court recognized that he made attempts through the court system to obtain custody of J. K. M. The court also found, however, that the father's attempts to have more involvement in the child's life were "sporadic and inconsistent," emphasizing that the father had not physically visited J. K. M. since December 2019 and instead relied on video calls to have contact with him. On this point, the trial court specifically noted that although the COVID-19 pandemic may have been a factor in the father's failure to exercise his visitation rights, the father had traveled to Georgia for court hearings on two separate occasions and made no attempt

5

to visit with J. K. M. during those trips. The court also noted that the father was in arrears for over $6,500 in child support and was paying only $168 per month despite a court order requiring him to pay $389 per month.

Based on these facts, the trial court found that there was clear and convincing evidence that J. K. M. would suffer long-term emotional harm if custody were awarded to the father. After the trial court entered its final order granting custody to the grandmother, the father filed this appeal.

As we evaluate this appeal, we are mindful that "under both the United States and Georgia Constitutions, parents have a fundamental right to the care and custody of their children."[3] This "is a fiercely guarded right that should be infringed upon only under the most compelling circumstances."[4]

In a custody dispute between a natural parent and a close third-party relative, like the grandmother in this case, Georgia law recognizes "a rebuttable presumption that it is in the best interest of a child to award custody to the parent of the child."[5] To

---

[3] *Mashburn v. Mashburn*, 353 Ga. App. 31, 41 (1) (836 SE2d 131) (2019).

[4] (Citation and punctuation omitted.) *Clark v. Wade*, 273 Ga. 587, 596-597 (IV) (544 SE2d 99) (2001) (plurality opinion).

[5] *Strickland v. Strickland*, 298 Ga. 630, 631 (1) (783 SE2d 606) (2016) (citing OCGA § 19-7-1 (b.1)).

overcome this presumption, the relative must show, by clear and convincing evidence, that parental custody would cause the child either physical harm or significant, long-term emotional harm.[6] "[A] change in home and school will often be difficult for a child, but some level of stress and discomfort may be warranted when the goal is reunification of the child with the parent."[7]

In its final order awarding permanent custody to the grandmother, the trial court found that the grandmother had been J. K. M.'s primary caretaker for the vast majority of his life, that J. K. M. had formed a strong bond with his grandmother and his two brothers, who resided in the same home, and that this was the only family J. K. M. had ever known. Even accepting these factual findings as true, however, "the trial court was not authorized to conclude that the grand[mother] had demonstrated by clear and convincing evidence that an award of custody to the [father] would cause either physical harm or significant, long-term emotional harm to [J. K. M.]".[8]

---

[6] Id.

[7] *Clark*, 273 Ga. at 598 (IV). See also *Bell v. Taylor*, 334 Ga. App. 267, 269 (779 SE2d 42) (2015) (the stress associated with moving to a different home and school falls within the level of stress and discomfort that is an acceptable price for reuniting a child and parent).

[8] *Jewell v. McGinnis*, 346 Ga. App. 733, 737 (1) (816 SE2d 683) (2018).

7

Crucially, there was no evidence suggesting that the father was physically abusive or unfit to care for J. K. M. or that the father's home, where he lived with his wife and eight-year-old stepdaughter, would be unsuitable for the child.[9] Additionally, although the trial court described the father's efforts to establish a relationship with J. K. M. as "sporadic and inconsistent[,]" the father's lack of visitation was partly the result of COVID-19 precautions and the parties agreed that, by the time of the final hearing, the father and J. K. M. were having video calls at least once a week. As to financial support, although the trial court found that the father was in arrears on child support and questioned why he had not provided more support for the child, the court did not find that the father would be unable to care for the child. Ultimately, we see no evidence in the record suggesting that J. K. M. would experience "significant, long-term emotional harm" — beyond the stress and discomfort associated with a change in home and school — as is required to justify infringing on the father's fiercely guarded right to custody of his child.[10]

---

[9] Compare *Braddock v. Lindsey*, 355 Ga. App. 700, 705-706 (2) (845 SE2d 731) (2020) (affirming trial court's decision awarding custody to grandparents over father where child experienced physical harm during visits with father and displayed irritable and negative behavior after visits in the father's home).

[10] See *Richello v. Wilkinson*, 361 Ga. App. 703 (865 SE2d 571) (2021) (reversing award of custody to grandparents over father because, although the

There is ample evidence that the grandmother has been a stable, loving caregiver for J. K. M. But to establish that she should be awarded custody over the father's objection, the grandmother was required to show by clear and convincing evidence that J. K. M. would suffer physical or significant, long-term emotional harm if custody were awarded to the father. In the absence of such a showing, we are required to reverse the trial court's order. Consequently, the judgment is reversed, and we remand the case to the superior court for further proceedings consistent with this opinion.

*Judgment reversed and case remanded with direction. Barnes, P. J., and Land, J., concur.*

---

grandparents had provided a safe and loving home since the mother's death, there was no evidence that returning custody to the father would cause the children physical or emotional harm or that the father was unable to provide for the children).